## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MCKINLEY MARCUS,

     Plaintiff,

v.                          Case No. 8:22-cv-1135-WFJ-AAS

TITAN AMERICA LLC and
TITAN FLORIDA, LLC,

     Defendants.

_____/

## <u>ORDER</u>

Before the Court are motions for summary judgment filed by each

Defendant (Dkts. 76, 78), Plaintiff's responses (Dkts. 80, 81), and the replies

(Dkts. 84, 85). After careful consideration of the submissions of the parties, the

applicable law, and the entire file, the Court concludes Defendants' motions are

due to be granted.

In this removed employment discrimination and retaliation case, Plaintiff

McKinley Marcus, a black African American man, sues both Defendants as his

employer: Titan America LLC ("Titan America") and Titan Florida, LLC ("Titan

Florida"). Defendants seek summary judgment on the following eight counts: (1)

race discrimination in violation of the Florida Civil Rights Acts of 1992 ("FCRA")

(Counts III and XI); (2) race discrimination in violation of 42 U.S.C. § 1981

(Counts V and XIII); (3) retaliation in violation of the FCRA (Counts IV and XII);

and (4) intentional infliction of emotional distress (Counts VIII and XVI).  The pairs of counts represent parallel claims against each Defendant.  All other counts have been disposed of by consent or dismissal.[1]

## PERTINENT FACTS

The following facts are set forth in the light most favorable to the nonmoving party, Plaintiff.

Plaintiff worked for Titan[2] as a ready-mix truck driver from November 9, 2016, until his termination almost three years later.  Dkt. 81-1 (Marcus Aff.) ¶ 2; Dkt. 77-1 (Marcus Dep.) at 15, 33.  Titan Florida owns ready-mix concrete plants in Florida and supplies sand, concrete block, and ready-mixed concrete to the construction industry.  Dkt. 79-3 ¶ 5.  Plaintiff's duties included loading the truck with the correct proportions of cement or chemicals, mixing the batch, cleaning the truck of excess debris, checking the "slump" of the mix in the drum of the truck, delivering the ready-mix concrete to the customers, and unloading the mixture at

---

[1] *See* Dkts. 75, 92 (orders remanding and dismissing without prejudice Counts I and IX for retaliatory discharge under Florida Worker's Compensation Law; Dkt. 80 at 3 (Plaintiff's consent to dismissal of Counts II and X for disability discrimination, Counts VI and XIV for negligent training under state law, and Counts VII and XV for state law civil assault and battery).

[2] The term "Titan" refers generally to Plaintiff's employer.  The Court addresses the distinction between the two Defendants later in this order.

2

the jobsite.[3]  Dkt. 77-1 at 15, 23.  Plaintiff performed these duties until June 28, 2019, when he slipped and fell on the job.  His injuries required that he be placed on light duty.  On October 8, 2019, about three months after the injuries, Plaintiff was terminated after a September suspension for safety violations and insubordination.  Plaintiff claims that he was falsely accused.

In relation to Plaintiff, the following individuals held key supervisory and managerial positions.  Plaintiff reported to Mike Kacprowicz (white male).  Mr. Kacprowicz answered to Aaron Pilgrim (white male), the manager in charge of the day-to-day operations of the Titan Florida plant group.  Dkt. 79-3 ¶ 9.  Rick Abbey (white male) was Titan Florida's regional or "local" manager in the Human Resources ("HR") department.  *Id*. ¶ 10.  Nicole Zajkowski (African American female) was senior to Mr. Abbey in HR.[4]  Dkt. 77-1 at 19.

---

[3] Slump describes the consistency of fresh, wet concrete mix.  *See generally Harleysville Worcester Ins. Co. v. Paramount Concrete*, 123 F. Supp. 3d 282, 286 n. 5 (D. Conn. 2015).  A slump test is conducted by placing freshly mixed concrete in a mold shaped as the frustum of a cone.  *See* Astm-c143 Slump Test.pdf.  When the mold is raised, the mixture subsides.  *Id*.  The vertical distance between the "original and displaced position of the center of the top surface of the concrete is measured and reported as the slump of the concrete."  *Id*.

The driver was required to check the slump factor both at the Titan plant and then recheck the slump factor of the concrete mix upon arrival at the customer site.  Dkt. 77-1 at 15, 23.  In Plaintiff's words, "you had to go up the ladder and you had to look down into that drum and you to make sure, because your—what we call slump. If your slump was wrong and you get rejected, you know, that goes against the driver, because it's the driver's responsibility."  *Id*. at 23.

[4] When asked at his deposition, "If I were to tell you [Ms. Zajkowski's] African American, do you have any evidence to contradict that," Plaintiff responded "no."  Dkt. 77-1 at 21. *But see generally* https://sfbwmag.com/2019-excellence-in-human-resource-awards/ last consulted 3/19/24 (photograph of Nicole Zajkowski, identified as HR Director for Titan).  The record otherwise does not contain her race.

A chronological progression of the events leading up to this action is laid out in the EEOC charge of discrimination filed on December 26, 2019.  Dkt. 85-2.  On the EEOC template form, Plaintiff checked the boxes for race, sex, and disability discrimination as well as retaliation.  *Id*. at 1.  He wrote the following:

> Around February 28, 2019, I went into another of [Titan's] plants located at [Anderson Road] to make a delivery and observed a noose hanging from the batch (near the loading area) area. At that time, I texted some pictures of the hanging noose to Mike [Kacprowicz], White, Plant Manager/Batch Supervisor. To my knowledge the noose was never taken down.

> Around April 19, 2019, I formally complained to Scott Zimmer, White, Operations Manager, about being sexually harassed by an employee at one of the Company's client locations (Baker Contracting). His name is David [Romero], White, Male, because he kept touching me and rubbing my hand and arm even after I asked him to stop. No correction action was taken.

> Around June 28, 2019, I was injured at my base plant (5353 Tyson Road) after getting out of truck, I slipped and fell and injured my back, neck, back of my head, right shoulder and right hip.

> Around August 1, 2019, I was placed on light duty by my physician of no bending/no carrying over 15 lbs./avoid climbing/kneeling/lifting floor to waist/pull/push/reach overhead/squat/twist. I was denied a reasonable accommodation/light duty by Lee Roberts, White, Regional Manager, Rick Abbey, White, Local HR person and Aaron Pilgrim, White, Operations Manager while Thomas Reynolds, White, Driver, was given an accommodation and light duty by being allowed to just sit in the breakroom for 8 hours a day instead of his regular job duties/functions as a Driver. The company told me that I had to sit outside under an 8 by 8 tent in a chair instead of being allowed to sit in the breakroom.

> Around October 8, 2019, I was falsely accused of insubordination and discharged.

4

*Id*.  Plaintiff closes his discrimination charge as follows:

> I believe that I have been discriminated against because of my race, Black, sex, Male, disability and harassed, denied a reasonable accommodation/light duty and discharged in retaliation for complaining about a noose being hung in one of the Company's locations and complaining about being sexually harassed in violation of [Title VII] and the [ADA].

*Id*. at 2.  Each of these incidents will be set forth in greater detail.

### *Rope in the Batch area at Anderson Road plant*

On February 28, 2019, Plaintiff drove his truck to the Anderson Road location at 6:00 a.m. when he claimed he saw a noose hanging above the area in the plant where the trucks are loaded.  Dkt. 77-1 at 19–20.  The Anderson Road plant was not Plaintiff's regular station, and the loading area was not accessible by the public.  *Id*. at 19–20.  Plaintiff took a picture on his phone and forwarded it to his supervisor.  *Id*.  Plaintiff claims he still has this photograph on his phone; but he never produced it in this record.  Another African American employee told Plaintiff that the rope looked too small to be a noose.  Dkt. 77-1 at 20.  The record is devoid of any evidence that this rope was intended to target Plaintiff.  Kacprowicz strongly disagreed with Plaintiff's description of the rope.  *Id*.

Plaintiff also reported his sighting to both HR managers—Mr. Abbey and Ms. Zajkowski.  *Id*. at 20–21.  These two, as well as Kacprowicz, made sure that

Plaintiff was not required to drive to the Anderson Road location again. *Id*. at 21. About two months later when Plaintiff did return, the rope was gone. *Id*.[5]

### *Incident with Employee of another Company*

On April 17, 2019, Plaintiff was on a jobsite of a Titan customer called Baker Construction. David Romero, one of the onsite supervisors, worked for Baker.[6] Dkt. 77-1 at 22–23. Romero grabbed and rubbed Plaintiff's calf while massaging one of Plaintiff's hands. *Id*. at 23, 26–27. This was not the first time that Romero had physically touched Plaintiff and perhaps other workers on the Baker jobsite. *Id*. at 24–26. Plaintiff verbally reported the unwanted contact to Kacprowicz. *Id*. at 24–25. He claims to have made a written statement some days later for Kacprowicz about Romero's "sexual harassment." *Id*. at 26.

What transpired next at the jobsite, however, resulted in a written warning to Plaintiff. Dkt. 77-5 at 1. When Romero touched him, Plaintiff became angry, grabbed a broom, and broke the brush handle on the bumper of a mixer truck. *Id*.; Dkt. 77-1 at 26–27. Plaintiff then threatened to "cut" Romero. Dkt. 77-1 at 28.

The counseling form that Plaintiff received states:

---

[5] The Court notes that Plaintiff's deposition testimony taken in 2023 (no rope after two months) directly contradicts his December 2019 discrimination charge (rope was never removed). Dkt. 77-1 at 21; Dkt. 85-2 at 1.

[6] Plaintiff described Mr. Romero as either Middle Eastern, Spanish, or Mexican. Dkt. 77-1 at 25.

> McKinley Marcus was on a jobsite in Tampa for Baker Construction on April 17th when he had an incident with one of the laborers on the Baker crew. McKinley was becoming frustrated by the physical contact that a laborer was giving him during this and past pours. He told the laborer to keep his distance. When that distance wasn't given McKinley took out his frustration by breaking a brush handle on the bumper of the mixer truck and by making a threatening comment to the laborer.

Dkt. 77-5 at 1.  The conduct is categorized as "aggressive and unprofessional behavior." *Id*.  The warning cites Titan's harassment policy, which provides: "Any employee who feels he or she is being harassed or illegally discriminated against must take the complaint directly to any member of management or Human Resources." *Id*.  The warning cautioned that threatening comments "should never be used" and that "further incidents will lead to additional counseling up to and including termination of employment." *Id*.  Plaintiff signed that he had read, understood, and discussed the "counseling" form.[7] *Id*.

Plaintiff does not deny that he broke another truck driver's brush handle on the mixer truck.  Dkt. 77-1 at 27.  He admits that he verbally threatened to cut Romero.  *Id*. at 28.  Titan did not allow Plaintiff to return to the Baker worksite for some time.  *Id*. at 29.

Notably, this April 17 incident involved an employee of a different company.  Plaintiff did not bring a claim for sexual harassment in the operative

---

[7] The form indicated that this incident was not Plaintiff's first infraction.  Dkt. 77-5 at 1.

complaint.  Dkt. 29.  The pleading mentions the unwanted touching within the two counts for civil assault and battery, but those claims have been dropped.  Nothing in this record shows, nor does Plaintiff argue, that there is any racial component associated with the actions of Romero.

*Workplace injury and Duty modifications*

On June 29, 2019, Plaintiff suffered an injury on the job—he slipped and fell at the construction site where he was working.  Dkt. 77-1 at 15, 34; Dkt. 81-1 ¶ 7.  As a result of the fall, he had headaches, back pain, and sciatica, among other conditions.  Dkt. 77-3 (Humbarger Dep.) at 306; Dkt. 81-1 ¶ 8.  The injury required Titan to give Plaintiff a light duty, modified work assignment.[8]

In contrast to his regular work of mixing concrete in the drum of a truck, slump testing, and delivering the mixtures to customer sites, Plaintiff's light duty assignment was to collect and record data on truck operations, including traffic flow, load times, stop infractions, and slump times.  Dkt. 77-2 at 4; Dkt. 81-1 ¶ 11; Dkt. 77-3 at 299, Ex. 8 (duty offer of Aug. 5, 2019), 306, 308 (physician's notes on workers' compensation form); Dkt. 85-1 (Humbarger Suppl. Aff.) ¶¶ 3–4.  The pay

---

[8] The medical treatment reporting form filled out by Jack Tseng, D.O. on June 29, 2019, indicated that Plaintiff could carry less than ten pounds, climb with no load, but should avoid kneeling, lifting, pulling, pushing, reaching overhead, and squatting.  Dkt. 77-5 at 8.  Plaintiff testified that he had restrictions on stooping, bending, lifting certain weights, and crawling.  Dkt. 77-2 at 4.

would remain the same, and the assignment would begin August 5, 2019.  Dkt. 77-3 at 299, Ex. 8.  In keeping with work restrictions, Plaintiff's hours were capped at 40.  *Id*.  Titan would review this initial assignment on August 29, 2019.  *Id*.

From the outset, Plaintiff was to perform this assignment in the parking lot under a tent with a canopy top while sitting in a chair.  Dkt. 81-1 ¶ 12.  Plaintiff complained about the overwhelming heat outside sitting for long periods of time and about the dust from the traffic which bothered his breathing and vision.  Dkt. 81-1 ¶¶ 13–14.  According to the second amended complaint, on August 20, 2019, Plaintiff requested to sit inside his personal vehicle to perform his job.  Dkt. 29 ¶ 20.  His demand was approved. [9]  Dkt. 81-1 ¶ 16; Dkt. 77-2 at 4.  Titan's concession to allow sitting in his pickup truck was never written into any of the official light duty memoranda.  The initial light duty assignment was extended with no changes.  Dkt. 77-3 at 301, Ex. 9 (duty offer of Aug. 29).

### *Participation in Titan America investigation*

The following incident is not mentioned in the charge of discrimination.  On July 30, 2019, the City of Tampa's Human Rights' office sent Plaintiff a letter

---

[9] Eventually, either Pilgrim or Abbey told him he could no longer work from his personal vehicle. *Compare* Dkt. 77-2 at 5 *with* Dkt. 81-1 ¶ 16.  Plaintiff's affidavit in opposition clarifies that permission to work from his pickup was not revoked until October 3, 2019.  Dkt. 81-1 ¶ 16.

informing him he had been named as a witness in an EEOC case filed by Edward

Figgs against Titan America.  Dkt. 81-2.  The City's case investigator wrote:

> Per our telephone conversation on July 11, 2019, you stated that you
> might be willing to provide answers to questions about your experience
> working at Titan America. . . . Please submit your responses to the
> [attached list of] questions on a notarized statement by August 9, 2019.

*Id*.  Plaintiff states he was a witness for Figgs.  He is unable to identify anyone at

Titan Florida who knew he served as a witness.  Dkt. 77-1 at 13–14.  Plaintiff

never told Kacprowicz, Pilgrim, or Abbey.


### _Meeting with Plaintiff, Kacprowicz, Pilgrim, and Abbey_

The written charge of discrimination is also silent about a September 11

meeting among Plaintiff, Kacprowicz, Pilgrim, and Abbey, which led to Plaintiff's

suspension.  Dkt. 77-5 at 2.[10]  On September 11, Plaintiff was sitting in the driver

break room when Kacprowicz entered and informed Plaintiff that Pilgrim and

Abbey were on their way to talk to Plaintiff about his light duty assignment.  Dkt.

77-1 at 30–32.  Kacprowicz asked him to walk up the stairs to the batch office on

---

[10] Mr. Taylor Humbarger is the present operations manager for the Westcoast region of Titan
Florida.  Dkt. 77-4 ¶ 2.  Attached to his affidavit are several business records including write-
ups, emails, and physician's restrictions concerning Plaintiff.  Dkt. 77-5.  Humbarger served as
the Rule 30(b)(6) corporate representative.  Dkt. 77-3.  At the deposition, he confirmed that the
documents were maintained by the company.  *See, e.g.*, Dkt. 77-3 at 276, 285–86.

the second floor for the meeting. [11]  *Id.* at 31.  At that point, a disagreement arose between Plaintiff and Kacprowicz about whether the doctor restrictions  of "climbing" included going up stairs.  *Id.*  Plaintiff stayed in the break room until Pilgrim and Abbey arrived.  *Id.*  Pilgrim and Abbey told Kacprowicz to try to locate a copy of all of restrictions.  Dkt. 77-5 at 3.  Pilgrim and Abbey then left to handle something at another Titan site.  *Id.*

The restriction was simply "no climbing."  Kacprowicz called Plaintiff's doctor's office, and the office told him that there were no restrictions for going up stairs.  Dkt. 77-5 at 3.  When Pilgrim and Abbey returned that afternoon, Plaintiff was still in the break room.  Dkt. 77-1 at 31; Dkt. 77-5 at 3.  Plaintiff insisted on a written statement from his doctor clarifying the climbing restriction.  Dkt. 77-5 at 3; Dkt. 81-1 ¶ 21.  Knowing this, Kacprowicz, Pilgrim, and Abbey suggested that the four of them meet at the old shop building in the back.  *Id.*  Plaintiff left the break room, got in his pickup truck, and drove to the back.  *Id.*  He avers that he was never told not to park his personal vehicle in the back.  Dkt. 81-1 ¶ 21.

Because it was cooler just outside the shop, a rolling chair was provided for Plaintiff.  Dkt. 77-5 at 3.  After Plaintiff parked, he walked over and took his hard hat off.  *Id.*  When asked by the managers and supervisor, Plaintiff eventually put

---

[11] The room above the break room was referred to as the computer room or the dispatch room or the batch room or batch office.  Dkt. 77-1 at 25, 31.  Reaching the top floor required walking up 10 to 20 feet of stairs.  *Id.* at 31.

his hard hat back on as Titan's rules required hard hats be worn when outside.
Dkt. 77-5 at 3; Dkt. 81-1 ¶ 23

Plaintiff next pulled out his cell phone and asked if he could record the
conversation.  Dkt. 77-1 at 32; Dkt. 77-5 at 3.  Abbey told him no, to put his phone
in his pickup truck.  Dkt. 77-1 at 32.  Plaintiff avers in this late-filed affidavit that
he complied with the request.  Dkt. 81-1 ¶ 23.

According to Titan, Plaintiff did not readily return the phone to his pickup
truck.  Dkt. 77-5 at 3.  Plaintiff first put the phone in his shirt pocket.  *Id*.  When
asked again to take his phone to the vehicle, Plaintiff responded no.  *Id*.  He was
asked a third time, and again refused.  *Id*.  On the fourth request, which was framed
as one coming from management and would be considered insubordination if
Plaintiff refused, Plaintiff complied.  *Id*.  Pilgrim documented that Plaintiff was
accusing them of harassing him.  *Id*. at 4.

When the discussion began about his modified duty assignment, Plaintiff
removed his hard hat for a second time, stating that he could not wear it.[12]  Dkt.
77-5 at 4.  Abbey asked Plaintiff to put his hard hat back on and explained that
wearing hard hats outside was required and that Plaintiff's medical work

---

[12] According to Humbarger, Abbey and Pilgrim "were trying to give Plaintiff a second light-duty
assignment when Plaintiff began arguing about the details of this work restrictions."  Dkt. 77-4 ¶
13.

restrictions did not excuse wearing a hard hat.  Dkt. 77-5 at 4.  According to

Titan's official write-up for this incident, Plaintiff refused on two separate times to

wear his hard hat at this meeting just outside the shop.  Dkt. 77-5 at 2.  Plaintiff

agreed that he took his hard hat off and did not want to put it back on, but

ultimately did put it back on.  Dkt. 77-2 at 6.

At this point, Plaintiff told them he needed to go see his doctor because he

was in pain.  *Id.*  Plaintiff was walking to his pickup truck when his cell phone

rang; it was Plaintiff's attorney returning his call.  Dkt. 77-1 at 32; Dkt. 81-1 ¶¶

23–25; Dkt. 77-5 at 4.  When Plaintiff answered the phone, which was on speaker,

Abbey overheard and told Plaintiff to talk with his attorney.  Dkt. 81-1 ¶¶ 25–26.

Abbey cautioned him not to drive off because heavy machinery was in the yard.

Dkt. 77-5 at 4.  Despite this warning, Plaintiff drove out of the back area to the

front.  *Id.*

Plaintiff stayed at Titan to talk with his attorney, and he also spoke with Ms.

Zajkowski.  Dkt. 77-5 at 4.  Plaintiff agreed to reconvene with Abbey, Pilgrim, and

Kacprowicz in the break room to discuss the modified duty assignment.  Dkt. 77-5

at 4.  Zajkowski participated via a speaker phone.  Dkt. 77-5 at 4.  Plaintiff was

suspended for "insubordination/safety violations" based on the incidents of

September 11.  Dkt. 77-5 at 2.

*Suspension*

The official written counseling form gave three reasons for the suspension: (1) refusing to wear a hard hat on two occasions—hard hats required in the yard; (2) disobeying orders not to drive his personal vehicle around the yard while talking on his cell phone—heavy machinery was active and company policy forbids operating a cell phone while driving; and (3) refusing several times to put cell phone in vehicle after Plaintiff attempted to record the event—following management instructions required.  Dkt. 77-5 at 2.  Plaintiff received, but refused to sign, the written suspension, which cautioned that "[f]urther policy violations will lead to additional disciplinary action up to and including termination."  Dkt. 77-4 ¶ 13, 77-5 at 2.  Plaintiff describes what he felt on September 11 as "being bullied."  Dkt. 77-2 at 7; Dkt. 81-1 ¶ 22.

*First Meeting after Suspension*

On September 27, 2019, Plaintiff was sitting in his pickup truck parked near the building with the driver break room (first floor) and batch office (second floor). Dkt. 77-1 at 30–31; Dkt. 77-2 at 7–8.  He parked near the building for shade while

he checked loads and recorded the time it took for drivers to "slump their truck down with the mixture," clean the truck, and leave the plant.[13]  Dkt. 77-1 at 30–31.

Unlike the meeting of September 11, on this day, Plaintiff successfully audiotaped and video-recorded parts of conversations with Abbey, Kacprowicz, Pilgrim, and Plaintiff in the break room.  Dkt. 77-1 at 32; Dkt. 77-2 at 8.  He placed his phone in the pocket of his safety vest to record.  Dkt. 77-1 at 32; Dkt. 77-2 at 8.  Plaintiff testified that he did not remember if anyone asked him if he was recording the meeting, but he did not ask permission to record, and no one gave him approval to record.  Dkt. 77-2 at 8.  During the conversation, Abbey was explaining to Plaintiff that he needed to be sitting underneath the tent to perform his assignment.  *Id*.  Plaintiff then told Pilgrim he felt faint and to call an ambulance.  *Id*. at 9.  This time Plaintiff was taken to the hospital.  *Id*. at 8.

### *Second modified duty assignment*

Plaintiff visited his doctor on September 30, and the doctor clarified his medical, work restrictions: "Continue sedentary duty. No standing, stooping, crawling, bending, *or stairs*. Patient should be permitted *to access a climate-controlled environment*."  Dkt. 77-3 at 309, Ex. 10 (emphasis added).  For the first

---

[13] Interestingly, when asked why he missed work between September 11 and September 27, Plaintiff responded that he did not remember missing that many days.  Dkt. 77-2 at 7–8.

time, Plaintiff's physician specifically eliminated the use of "stairs" and directed Plaintiff be given "access" to the break room.

The next day, Pilgrim conveyed to Plaintiff a new light duty assignment: "Employee will be provided with a shaded area in which to sit along with a *cushioned chair without wheels*. Employee can *access the climate-controlled driver breakroom one time per hour for ten minutes*." Dkt. 77-3 at 310, Ex. 11 (duty offer of Oct. 1, 2019) (emphasis added). Since the date of his injury, Titan had provided a covered, open-air tent for Plaintiff to perform his light duty job. Titan had also permitted him to sit in his pickup truck without reprimand. This new offer added that a cushioned chair would now be provided under the tent, and Plaintiff could spend ten minutes every hour in the break room.

Plaintiff returned to work on October 2. Dkt. 77-2 at 10. The following day, October 3, Plaintiff was sitting in his pickup when Kacprowicz approached and told him that he was no longer permitted to sit in his personal vehicle to conduct his light duty work. Dkt. 77-2 at 4–5, 10; Dkt. 81-1 ¶ 16. That same day, Kacprowicz kept a record of how much time Plaintiff spent in the break room, which was far longer than ten minutes per hour. Dkt. 77-5 at 5. Plaintiff knew he could not count trucks from the break room because there were no windows. Dkt. 77-2 at 4, 10. He acknowledged that he could perform his light duty assignment sitting in the chair under the open-air tent. *Id*. at 4.

16

After Plaintiff was told he could no longer work from his personal vehicle, he admitted that he "did not stay underneath the tent."  Dkt. 77-2 at 5.  Plaintiff said he could not remember, but did not dispute, that on October 7 he was in the break room for 2.8 hours.  Dkt. 77-2 at 10.  He stated he did not recall how long he spent in the break room the next day—October 8.  *Id*.  On both these days, the individual overseeing operations at the plant observed Plaintiff sitting in the break room his entire time at the facility.  Dkt. 77-5 at 6.

On October 8, Titan told Plaintiff that he was terminated for insubordination, which decision was approved by Abbey.  Dkt. 77-2 at 5, 11.  At this time, Plaintiff had been on light duty since the date of his injury in late June.  Dkt. 77-1 at 15.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute means evidence "such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  It is not enough for the non-moving party to posit that "the jury might, and legally could, disbelieve the moving party's evidence."  *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citing *Anderson*, 477

17

U.S. at 256).  The non-moving party must present "affirmative evidence that would allow a reasonable jury to rule for him."  *Id*. (internal quotation marks omitted).

The court must not weigh conflicting evidence or make credibility determinations but must draw all reasonable inferences from the evidence in favor of the non-moving party.  *United States ex rel. Bibby v. Mortg. Inv. Corp.*, 987 F.3d 1340, 1346 (11th Cir. 2021) (citations omitted).  An inference is reasonable if it is not based on pure conjecture and speculation.  *Hinson*, 927 F.3d at 1115 (citation omitted); *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (citations omitted).

## DISCUSSION

### I. Race Discrimination under FCRA and § 1981

In an intentional race discrimination case based on circumstantial evidence under either the FCRA or § 1981, the plaintiff must first demonstrate its *prima facie* case: (1) membership in a protected class; (2) an adverse employment action; (3) qualifications to perform the job at issue; and (4) a similarly situated employee outside the protected class (comparator) was treated more favorably.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lewis v. City of Union City,*

*Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) *(en banc) (Lewis I).*[14]  If the plaintiff satisfies these criteria, then the burden shifts to the defendant to articulate its legitimate, nondiscriminatory reasons for the adverse action.  *Lewis I*, 918 F.3d at 1221.  If the defendant meets this "exceedingly light" burden of production, then the plaintiff must show the reasons are pretextual.  *Yelling v. St. Vincent's Health System*, 82 F.4th 1329, 1340 (11th Cir. 2023) (citing *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Falling short of satisfying the *prima facie* case under *McDonnell Douglas* does not necessarily portend the end of the plaintiff's case.  The plaintiff will survive summary judgment if he demonstrates a "convincing mosaic of circumstantial evidence" that would allow a jury to infer intentional discrimination."  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  Intentional discrimination is the "ultimate inquiry" in the employment context.  *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944–47 (11th Cir. 2023) (citing *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022)).

---

[14] Although *Lewis I* is a Title VII case, courts apply the same framework to analyze a claim under the FCRA.  *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387, 1389–90 (11th Cir. 1998)); *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010) (noting that Title VII decisions are applicable to FCRA claims for discrimination and retaliation); *see also Arnold v. Heartland Dental, LLC*, 101 F. Supp. 3d 1220, 1224–25 (M.D. Fla. 2015) (collecting cases).

Under the *McDonnell Douglas* framework, Plaintiff undisputedly meets two of the four factors of the *prima facie* case. He is a black African American, and Titan fired him. [15] As to the remaining elements, however, Titan disputes that Plaintiff was qualified for the job and challenges the adequacy of the comparators. The Court will also address the light duty assignment itself as an adverse action, which Plaintiff did not plead and raises for the first time in his response. Dkt. 29; Dkt. 80 at 2; Dkt. 85 at 2.

### A.   Qualified for the job

In the context of Title VII, which does not cover discrimination based on a disability, a person is qualified for the job if he has the skills necessary to perform the position offered by the employer and satisfies the employer's criteria. *See Vessels v. Alt. Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). It has been said that the "most common nondiscriminatory reasons for [rejecting a plaintiff is] that the employee was not qualified for the position." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (internal quotation marks omitted).

---

[15] The operative complaint alleges that Plaintiff's *termination* represented discriminatory and retaliatory conduct. Dkt. 29 ¶¶ 17, 25, 63, 64, 139, 140.

Prior to his June 2019 injury, Plaintiff was clearly qualified for the job of ready-mix truck driver.  He had worked in this position for Titan close to three years.[16]

Titan challenges whether Plaintiff was still qualified for the job after the accident.  Titan contends that Plaintiff was not qualified for the job either at the time of his duty modification resulting from the accident or at the time of his later termination in October.  There is no question that Plaintiff was unable to perform the duties of his job of truck driver from the time of his accident to his discharge.

With respect to the duties of the modified assignment—collecting data by documenting various plant activities for statistical purposes—Plaintiff argues the issue of whether he was qualified is disputed.  In doing so, Plaintiff takes contrary positions.  He contends he was qualified to collect the data "but not for sitting all day in the sun."  Dkt. 80 at 15.  The record is clear that Titan provided an open-air tent and a chair for Plaintiff to sit outside to perform his light assignment.  Titan wholly complied with the physician's specific orders regarding restrictions.  Titan

---

[16] Title VII cases have addressed situations where an employee is discharged from a long-held position for alleged poor performance. *See, e.g.*, *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir.1999) (citing *Young v. General Foods Corp.*, 840 F.2d 825, 830 n.3 (11th Cir. 1988)).  In such cases, courts distinguish between poor performance and being qualified for the job. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993) (explaining that reprimands for performance of the job do not establish that plaintiff is unqualified for the job).  The poor performance aspect should be postponed for consideration until the pretextual stage. *See Damon*, 196 F.3d at 1360 (citations omitted).

even permitted Plaintiff to sit in his pickup and collect data for about two weeks. Titan was not required by the physician's restrictions to provide him a set amount of time in a climate-controlled environment until the last day of September.

Keeping in mind this is a claim under the FCRA (Title VII), the focus is whether Plaintiff was discriminated against based on race, not disability. What constitutes "qualified" under Title VII is not the same as the qualification definitions promulgated pursuant to the statutes protecting discrimination because of a disability. That said, Plaintiff has failed to show he was qualified to perform his light duty assignment.

### B.   Comparators

To establish a comparator under Title VII, the plaintiff must show that he was treated less favorably than a similarly situated employee outside of his protected class. *Lewis I*, 918 F.3d at 1226. The comparator must be "similarly situated in all material respects." *Anthony v. Georgia*, 69 F.4th 796, 805 (11th Cir. 2023) (quoting *Lewis I*, 918 F.3d at 1224). A "similarly situated" individual is an employee who was "engaged in the same basic conduct (or misconduct) as the plaintiff, . . . [was] subject to the same employment policy, guideline, or rule, . . . [reported to the] same supervisor as the plaintiff, . . . [and] share[d] the plaintiff's employment or disciplinary history." *Id*. (quoting *Lewis I*, 918 F.3d at 1227–28).

A plaintiff and his comparators must be sufficiently similar in an objective sense, meaning that they "cannot reasonably be distinguished." *Id*. (citing *Lewis I*, 918 F.3d at 1228, quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

Plaintiff "observed no fewer than two" ready-mix truck drivers who were not black and performed their light duty assignments in the driver break room. Dkt. 81-1 ¶ 4.  Plaintiff identified only one comparator in his charge of discrimination—Thomas Reynolds (white truck driver).  Dkt. 85-2 at 2.  Plaintiff has since named "Alex" as a ready-mix truck driver who suffered injuries requiring light duty.  Dkt. 81-1 ¶ 5; Dkt. 77-1 at 14, 16.  "Alex" was "white or Spanish." Dkt. 77-1 at 16.  No other details are provided about "Alex" and Titan has been unable to identify any individual fitting this description who worked at Titan during the same years and location as Plaintiff.  Dkt. 85 at 5.  Thus, "Alex" cannot be compared to Plaintiff.

Plaintiff further added Kacprowicz, his supervisor, as a comparator for the first time in his opposition.  Dkt. 81-1 ¶ 6.  Plaintiff claims that when Kacprowicz used to be a ready-mix truck driver, he was given a light duty in a break room at a different plant. [17] *Id*. ¶ 6.  Kacprowicz necessarily reported to a different supervisor.  He is not similarly situated to Plaintiff.

---

[17] Kacprowicz was a ready-mix truck driver at a prior, unspecified time at a different plant.

This leaves Reynolds as the only potential comparator.  According to Plaintiff, when Reynolds twisted his ankle on the job, he was permitted to serve his light duty in the break room.  Dkt. 77-1 at 14.  Plaintiff recalled only that Reynolds' light duty was "for at least two days . . . could have been a week." *Id*. at 14–15.  Titan's records reveal that Reynolds was injured Tuesday, November 21, 2017, and was released to work without restrictions on November 28, 2017.  Dkt. 77-4 (Humbarger Aff.) at 3.  Reynolds' injury required the use of crutches, which prevented him from walking in the yard per company safety rules.  *Id*.  Thus, Reynolds' light duty assignment required that he work inside the break room and away from the yard area.  *Id*.

Reynolds and Plaintiff were similarly situated in that they were both ready-mix truck drivers who shared the same supervisor and were subject to the same workplace policies.  Both were injured and received modified light duty assignments.  At this juncture, however, their similarities fade.

There is no evidence that Reynolds had the same or similar injury as Plaintiff thereby requiring the same light duty assignment.  Reynolds had to use crutches to walk or move about.  Plaintiff's injuries and physical restrictions did not require him to use crutches or a cane.  Dkt. 77-2 at 4.  This distinction permitted Plaintiff to work in the yard but not Reynolds.  Reynolds' light duty

lasted no more than five days total.  Plaintiff remained on light duty for more than two months and was on light duty at the time of discharge.

Finally, there is no record of a disciplinary history, or any employment history, of Reynolds and therefore no evidence to compare whether Reynolds conducted himself similarly to Plaintiff.  Because Reynolds can reasonably be distinguished in this way, he is not similarly situated to Plaintiff in all material respects.  Accordingly, Plaintiff has failed to show the last element of a *prima facie* case—the existence of a comparator.[18]

### C.   Convincing mosaic of circumstantial evidence

The ultimate issue in determining intentional discrimination is whether race, as opposed to disability or anything else, was the true reason Plaintiff received the modified position and was later terminated.  Establishing a *prima facie* case under *McDonnell Douglas* is only one method.  Under an alternative "convincing mosaic" analysis, the plaintiff must point to evidence showing (1) suspicious

---

[18] In *Tynes*, the Eleventh Circuit reviewed the denial of a renewed motion for judgment as a matter of law after a jury-verdict.  88 F.4th at 944–47.  *Tynes* explained that although the failure to establish the four elements of the *prima facie* case typically "reflects a failure of the overall evidence," this is not always true.  *Id*. at 945.  For example, the absence of a comparator does not automatically render the plaintiff's case untenable.  *Id*. at 947.  In the instant case, however, the Court does not find the differences between Reynolds and Plaintiff sufficiently material, as discussed above, to invoke a weighing of the two by the trier of fact.  Nevertheless, the question of whether the overall evidence might infer intentional discrimination will be fleshed out under the alternative "convincing mosaic" analysis.

timing, ambiguous statements, or other information from which discriminatory intent might be drawn, (2) "systematically better treatment of similarly situated employees," and (3) pretext. *Jenkins*, 26 F.4th at 1250 (citing *Lewis II*, 934 F.3d at 1185). The Court analyzes the evidence under a "convincing mosaic" model, even though Plaintiff does not expressly name this method or cite such authority in his papers.

1. Suspicious Timing

Under the first prong, the record is devoid of any evidence of ambiguous statements. For example, no one at Titan is alleged to have made any statement that Plaintiff interpreted to invoke race in any way.

With respect to suspicious timing, over seven months passed from the rope sighting to his termination. Even if the rope were directed at Plaintiff and intended to threaten him, which there is no evidence of in this case, seven months does not arouse suspicion. Nor does the four months from the rope incident to the light duty assignment in July. Even if one could argue that four months was close enough, it coincided precisely with Plaintiff's injury. This period, standing alone, does not suggest that Titan seized upon an opportunity—his injury—to punish and discriminate against Plaintiff by making him work outside under a tent.

From July to October, as soon as the medical and work restrictions set by Plaintiff's physician changed, Titan adjusted the assignment in step. For example,

immediately after Plaintiff voiced his discontent and finally saw his physician on September 30, Titan complied with the medical restrictions to add ten-minute intervals once per hour in the break room.  That is not to say Plaintiff did not experience heat while sitting under the tent, but neither was Titan extremely rigid in policing Plaintiff.  He was permitted (albeit off the record, not in writing) to sit in his pickup truck to count trucks for a portion of this period.

Finally, Plaintiff's suspension in September was based on conduct (insubordination) occurring that month.   It cannot be said to be in close temporal proximity to either the rope incident or the April write-up.  *Cf. Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1249 (S.D. Fla. 2022) (finding no suspicious timing where termination coincided with employee's misconduct).

## 2.   Pretext

Because the second consideration of systematically better treatment of similarly situated employees is not present, the Court now examines the third factor—pretext.  Titan's proffered reason for termination in October is Plaintiff's insubordination.  Its proffered reason for the light duty assignment in June is the medical and work restrictions imposed by Plaintiff's physician.  To rebut these proffered reasons, the plaintiff is not required to come forward with additional proof of discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 140–41 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  Yet, it

27

is irrelevant and insufficient if the plaintiff merely disagrees with the reason without evidence permitting an inference of discrimination. [19] *Lewis I*, 918 F.3d at 1221 & n.6.

Showing pretext requires that the employee "cast sufficient doubt" on the articulated nondiscriminatory reasons to "permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1323–24 (11th Cir. 2023) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).[20] Specifically, the plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons such that "a reasonable factfinder could find them unworthy of credence." *Id*. The employer's reason must be ill-founded or false, and unlawful discrimination must be the true reason for the decision. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (citing *St. Mary's,* 509 U.S. at 515).[21]

---

[19] *See Jones v. Gadsden Cnty. Sch.*, 2024 WL 446241, at *3 (11th Cir. Feb. 6, 2024) (unpublished order) (citing same).

[20] *Phillips* did not turn on, or discuss, a "convincing mosaic" evaluation.  Rather, *Phillips* determined that the district court erred in its analysis of pretext.

[21] *See also Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1267 (11th Cir. 2010) (holding plaintiff's burden "is to show not just that [the employer's] proffered reasons for firing [the employee] were ill-founded but that unlawful discrimination was the true reason").

"The inquiry into pretext centers on the employer's beliefs about the employee's conduct." *Phillips*, 87 F.4th at 1324 (citations and internal quotation marks omitted). The plaintiff may not successfully argue that he believed his conduct did not amount to insubordination or that he should not have been fired for insubordinate conduct. In *Phillips*, the plaintiff argued that "the conduct itself never happened." *Id*. at 1324. Here, unlike *Phillips*, Plaintiff admits the conduct for which he was suspended in September involving safety violations but asserts that this conduct did not amount to a "refusal" to follow instructions. In October when he was terminated, Plaintiff admits that he stayed in the break room long past ten minutes per hour for at least two days. Thus, the plausibility of Titan's proffered reason for firing Plaintiff does not depend on a disputed issue of fact.

Nevertheless, Plaintiff contends that both Titan's light duty assignment and later termination were pretext for unlawful discrimination. The Court will review the incidents leading up to each.

The rope and unwanted touching incidents were the only two incidents before Plaintiff's injury and light duty assignment in June. On the last day of February, Plaintiff observed and photographed what he thought was a noose at another Titan location. Plaintiff admits that another African American employee told him that the rope looked too small to be noose. Dkt. 77-1 at 20. There is no evidence that it was either directed at Plaintiff or was known to exist by anyone at

Titan, much less intended to target Plaintiff because of his race.  As soon as

Plaintiff brought this to the attention of Titan, he was never again required to

transport cement to that location.  Although he claimed in his written charge of

discrimination that the rope was never taken down, the evidence and his own

testimony contradict that statement in the charge.  Plaintiff testified that when he

did return to the Anderson Road plant less than two months later, the rope was

gone.  Dkt. 77-1 at 21.  Plaintiff has not produced in these proceedings the

photograph he took of the rope, which he claims is still on his phone.

Apart from the rope incident, Plaintiff complained in mid-April about

unwanted touching from Romero, a male employee of Baker Construction at an

offsite job.  This incident with Romero is categorized by Plaintiff himself as sex-

based harassment, and there is no evidence or intimation that race had anything to

do with the encounter.  Plaintiff ignores that he received a written warning because

he lost control, broke a brush handle over a truck, and threatened to "cut" Romero.

Plaintiff does not deny his conduct.  This April written warning cautioned that any

further incidents would lead to termination.

The next alleged act of discrimination is Titan's second disciplinary write-up

in September.  Plaintiff argues that the underlying facts of what transpired on

September 11 were not true, but pretextual, and did not amount to insubordination.

Specifically, he claims that 1) he never "refused to wear" his hard hat, 2) he had

permission to drive his personal vehicle around the property while talking on his cell phone, and 3) he put his cell phone in his personal vehicle as directed. Dkt. 80, at 16–18. In reviewing the facts, the issue is not whether Titan's conclusion that Plaintiff was insubordinate is correct. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). The issue is whether the decision was an honest one or was motivated by "unlawful discriminatory *animus*." *Id*. (emphasis added).

Plaintiff admitted that he took off his hard hat several times, and each time he was told to put it back on. He did not obey these directives immediately. In fact, he had to be told after several requests that if he did not obey the directive coming from management, he would be written up for insubordination. It is undisputed that his work restrictions did not prevent him from wearing a hard hat. Based on this evidence, Titan believed and honestly characterized the refusals as insubordination. Plaintiff may not now take issue with Titan's reasonable and honest belief.

With respect to driving in the yard area near the back shop, the evidence shows that Plaintiff did not wait for permission to park in a safe spot. Plaintiff admits that Abbey told him not to drive off. Whether driving a personal vehicle while talking on a cell phone constitutes a violation of company policies is beside the point. Plaintiff failed to obey Abbey's directive not to drive off in the potentially dangerous back shop area with heavy equipment moving about.

31

Lastly, Plaintiff did not place his cell phone in his pickup until after he was suspected of continuing to try to record the conversations when he had been clearly told not to record them.  As admitted by Plaintiff, he did not place his cell phone in his car until Abbey told him he was asserting his managerial position and would consider it insubordination if Plaintiff did not comply.  In short, Plaintiff's points amount to no more than asking this Court to find that he was not insubordinate contrary to Titan's honest conclusion.

The Court finds that Plaintiff has failed to meet his burden of showing a mosaic evincing intentional discrimination.  After drawing all reasonable inferences in favor of Plaintiff, no reasonable jury could conclude that the light duty assignment was intentionally crafted to discriminate against him, or that he was suspended and terminated because he is African American.  *See Flowers v. Troup Cnty., Ga. Sch. Dist.*, 1 F. Supp. 3d 1363, 1381 (N.D. Ga. 2014).

## II.  Retaliation

To establish a *prima facie* case of Title VII or FCRA retaliation, the plaintiff must show that he engaged in statutorily protected conduct, suffered an adverse employment action, and that there was a causal connection between the protected conduct and the adverse action.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (Title VII retaliation claims); *Alvarez v. Royal Alt.*

32

*Develops., Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010).  The burden-shifting

analysis begins after the *prima facie* case is established, and the employer must

articulate a legitimate, non-retaliatory reason for the adverse employment action.

*See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010)

(applying *McDonnell Douglas* to Title VII retaliation claims).

### A.   Statutorily protected activity

"Under the Participation Clause of Title VII's anti-retaliation provision, an

employee is protected from discrimination if [he] 'has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing

under this subchapter.'"  *See* 42 U.S.C. § 2000e–3(a); *Anduze v. Fla. Atl. Univ.*,

151 F. App'x 875, 877 (11th Cir. 2005).  The FCRA prohibits an employer from

discriminating against any person who has "testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under this section."  Fla.

Stat. § 760.10(7).  Florida courts look to federal case law when examining FCRA

retaliation claims.  *See Hinton v. Supervision Int'l, Inc.*, 942 So. 2d 986, 989 (Fla.

5th DCA 2006).

According to Plaintiff, Titan's retaliatory conduct was prompted by

Plaintiff's participation in July and August 2019 in an EEOC investigation of a

Titan American employee, Edward Figgs.  In contrast, Titan argues that Plaintiff's

retaliation claim is barred as unexhausted because Plaintiff did not state his

participation in the *Figgs* investigation in his written charge of discrimination with the EEOC.  Titan is correct.

Before any lawsuit is filed, the EEOC must have the first opportunity to investigate the alleged discriminatory practices.  *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004).  The scope of the judicial complaint is limited to the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970)).

On the EEOC template form, Plaintiff clearly checked the "retaliation" and "discrimination" boxes.  Had he not done so, his charge still would not be deemed unexhausted based on a mere procedural technicality.  *See McWhorter v. Nucor Steel Birmingham Inc.*, 304 F. Supp. 3d 1185, 1191 (N.D. Ala. 2018) (recognizing that "the mere failure to check a box is not dispositive"); *Davis v. Infinity Ins. Co.*, No. 15-cv-01111, 2017 WL 4224588, at *8 (N.D. Ala. Sept. 22, 2017) (same).  Yet the investigating agency only has notice of the facts and incidents alluded to in the charge.

Here, Plaintiff's written charge does not refer at all to the *Figgs* case or his helping an agency in the investigation of any employee claiming discrimination. There is no evidence that any of the decision-makers at Titan relative to Plaintiff

knew that the *Figgs* case existed or that Plaintiff had spoken with someone at the investigating agency about Titan and discrimination.  Because an investigation could not reasonably be expected to grow out of the charge, Plaintiff cannot claim retaliation based on any participation in the *Figgs* case.

Plaintiff also argues that Titan retaliated against him for "reporting race-based hostile work conditions."  Dkt. 80 at 2.  It is unclear whether Plaintiff references his complaining about the rope in February or the repeated protests "to Titan Florida managers about the indignity and harshness of conditions of his specially created *ad hoc* temporary light duty assignment outdoors."  *Id*. at 9.  While Plaintiff's February complaint to Kacprowicz about the rope was based on race, there is no evidence that his complaints about the hot conditions of his light duty job were race-based.  Thus, Plaintiff has failed to show he was involved in protected activity when he complained about his job modification.

### B.   *Adverse action*

As noted earlier, Plaintiff raises for the first time in his response that the light duty assignment given after his June injury constitutes an adverse employment action.  Dkt. 80 at 2; Dkt. 85 at 2.  Plaintiff argues that Titan retaliated against him by contriving a light duty assignment with "oppressive, embarrassing, and humiliating work conditions outdoors in the Florida heat in full view of

everyone who entered or exited the plant, which it never before required of any white or non-African American worker to endure." Dkt. 80 at 2.

Two points discredit Plaintiff's contention. Participation in the EEOC investigation did not occur until after he was injured and received the light duty assignment. Second, Plaintiff's assignment was an established, standard light duty job—to count trucks and record slump times, load times, and traffic flow. Dkt. 85 at 2, Dkt. 85-1 ¶¶ 3–4. It was not unique.

### *C.   Causal connection*

The causal connection is shown by demonstrating that a plaintiff's protected activity and an adverse employment action are "not wholly unrelated." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135–36 (11th Cir. 2020) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277–78 (11th Cir. 2008)). Courts look to the temporal proximity between the two. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220–21 (11th Cir. 2004)). Three to four months is insufficient. *Thomas*, 506 F.3d at 1364 (collecting cases). Plaintiff must also show that Mr. Lee Roberts[22] fired Plaintiff knowing that he was engaged in the protected activity of assisting a City investigator with another employee's EEOC claim or complaining

---

[22] Mr. Roberts is the Titan employee who fired Plaintiff. Dkt. 77-2 at 5.

about some "race-based hostile work conditions."  *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799–800 (11th Cir. 2000) (affirming that plaintiff in Title VII retaliation claim must present sufficient evidence to establish that the decision maker was aware of protected activity to establish temporal proximity and causal connection, citing *Clover v. Total System Servs., Inc.*, 176 F.3d 1346, 1355–56 (11th Cir. 1999)).

"[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protect activity."  *Houston v. R.T.G. Furniture Corp.*, No. 8:22-cv-2878-VMC-TGW, 2024 WL 37740, at *17 (M.D. Fla. Jan. 3, 2024) (quoting *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520–23 (11th Cir. 2007) (unpublished order)).  The causal chain may be broken by the plaintiff's act of misconduct.  *Hall v. Coal Bed Servs., Inc.*, No. 7:22-cv-513-LSC, 2024 WL 407490, at *7 n.8 (N.D. Ala. Feb. 2, 2024) (citing *Hankins*, 237 F. App'x at 521 and *Henderson v. FedEx Express*, 442 F. App'x 502, 504 (11th Cir. 2011)).  In *Hall*, the plaintiffs smoked marijuana on the job and refused to take drug tests about one month after the protected expression.  The plaintiffs were terminated, and the court found that the employees' misconduct broke the causal chain.  In *Hankins*, five days after the employee reported racial bias, she yelled at a co-worker for cutting in line.  The violation of company rules was an intervening act

that severed the causal connection.  In *Henderson*, the employee's falsification of his time card was a superseding cause that broke the causal chain.

Had the managers known about Plaintiff's participation in the *Figgs* investigation,[23] Plaintiff's insubordination in September would have broken the causal chain between the participation and his termination in October.  If Plaintiff intends to rely on the reporting of the rope in February as the cause of his particular light duty assignment, his misconduct in April with Romero of Baker Construction broke any causal chain.

Had Plaintiff met his *prima facie* case of retaliation, he would proceed to the pretextual stage where the court must be persuaded that the employer's proffered reason is unworthy of credence and that retaliation was the real reason.  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1061 (11th Cir. 1999).  An employer's good faith belief that that the employee's actions were insubordinate constitutes a legitimate, non-retaliatory reason for termination.  *Richardson v. Hapag-Lloyd (Am.), LLC*, No. 1:22-cv-3275-SDG-CMS, 2023 WL 9316875, at *12 (N.D. Ga. Nov. 29, 2023) (citations omitted).  As discussed in the context of discrimination, Plaintiff has failed to show pretext.

---

[23] *See Brungart*, 231 F.3d at 799–800 (requiring decision maker's knowledge to be shown by plaintiff to establish causal connection in the first instance).

38

## III.   Intentional Infliction of Emotional Distress

The *prima facie* case for intentional infliction of emotional distress under Florida law requires that "(1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous, beyond all bounds of decency, and odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the distress was severe." *Moore v. Pederson*, 806 F.3d 1036, 1053 (11th Cir. 2015) (citing Florida law).   The outrageousness of the conduct is a question of law for the court.   *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007).   An objective test is applied to determine whether the conduct is outrageous—not the subjective response of the person claiming emotional distress.   *Lincoln v. Fla. Gas Transmission Co.*, 608 F. App'x 721, 722 (11th Cir. 2015) (citing *Steadman*).   The standard is extremely high.

Applying this extremely high standard to the evidence, the Court finds Titan's conduct is not objectively outrageous.   It is therefore unnecessary to address the remaining arguments.   Summary judgment must be granted on this claim.

## IV.   Relationship between the Defendants

As a final note, Titan America is not Plaintiff's employer.   Titan America is the parent corporation of Titan Florida, LLC, and Titan Florida is one of many

wholly owned subsidiaries of Titan America.  Dkt. 79-4 ¶¶ 4, 6.  Each Defendant

maintains its own financial records and has separate tax identification numbers,

telephone numbers, and bank accounts.  *Id*. ¶¶ 6, 7.  None of Titan America's

employees were involved in Plaintiff's hiring, training, day-to-day assignments, or

discipline and had no role in the day-to-day operations of Titan Florida.  *Id*. ¶ 10.

Titan America provided to Titan Florida an employee handbook, payroll

processing, and administration of employee benefits, all for which Titan Florida

paid.  *Id*. ¶ 12.  Titan America does not compensate Florida Titan employees.  *Id*. ¶

13.

Plaintiff asserts that both entities are his employers.  He claims that Titan

America is his employer because it was Titan America that prepared and provided

the employee handbook.  Plaintiff also avers that the truck he drove, the building,

and "all stationery I ever saw" had the name Titan America on them.  Dkt. 81-1 ¶

3.  These facts, assumed to be true on summary judgment, do not create a genuine

issue of disputed material fact.  Nor will the Court make legal or factual arguments

on Plaintiff's behalf regarding Titan America's employer status under Title VII

discrimination and retaliation claims.[24]  Thus, Titan America is not liable because

---

[24] Defendant Titan America sets out the three applicable tests to determine what constitutes an employer for purposes of Title VII discrimination and retaliation: (1) the single employer test; (2) the agency test; and (3) the joint employer test. *See McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (single employer); *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004) (agency principles); *Peppers v. Cobb Cnty, Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016) (citing *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995) and

it is not Plaintiff's employer.  Even if it were, under Plaintiff's theory, it is not

liable for the substantive reasons stated in the opinion above.

## CONCLUSION

Accordingly, Defendants' motions for summary judgment (Dkts. 76, 78) are

**GRANTED**.  The Clerk is directed to enter final summary judgment in favor of

Defendants and against Plaintiff, terminate any pending deadlines and motions,

and close this case.

**DONE AND ORDERED** at Tampa, Florida, on March 20, 2024.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO**:
Counsel of record

---

*Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1243 (11th Cir. 1998)) (joint employer).  Dkt.
84 at 4 n.1.